RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0391p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GENORA JONES, as the Personal
Representative of the Estate of CLAYTON
JONES,

              *Plaintiff-Appellant,*

      *v.*

SCOTT BYRNES, et al.,

              *Defendants-Appellees.*

No. 08-1889

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-12756—Sean F. Cox, District Judge.

Argued: October 9, 2009

Decided and Filed: November 9, 2009

Before: MARTIN, GUY, and McKEAGUE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Joel B. Sklar, LAW OFFICE, Detroit, Michigan, for Appellant. Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees. **ON BRIEF:** Joel B. Sklar, LAW OFFICE, Detroit, Michigan, for Appellant. Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees.

     The court delivered a PER CURIAM opinion. MARTIN, J. (pp. 11-13), delivered a separate opinion concurring in the disposition of this case.

———————————

## OPINION

———————————

     PER CURIAM. Genora Jones brings this action under 42 U.S.C. § 1983 against two police officers of the Redford Township, Michigan police department[1] on behalf of the

———————

[1] Redford Township is a suburb of Detroit.

1

estate of her husband, Clayton Jones.  The officers were engaged in a high-speed car chase of two men suspected of armed robbery on January 23, 2006 around 5:00 a.m. The suspects extinguished their car's headlights approximately four miles into the chase, presumably to make it more difficult for the police to see their car.  The effect was also to make their car difficult for oncoming traffic to see in pre-dawn light.  The chase proceeded for approximately two more miles until the fleeing suspects collided with Jones as he turned into a gas station on his way to work.  Jones died as a result of the collision.

His estate sued the officers, alleging that they deprived Jones of his Fourteenth Amendment substantive due process rights when the officers failed to suspend the chase after the suspects extinguished the car's headlights.  The officers asserted qualified immunity.  The district court entered summary judgment for the officers, finding that the officers' actions did not "shock the conscience" as required by *Lewis v. County of Sacramento*, 523 U.S. 833 (1998).  The court further found that, even if the officers' conduct did "shock the conscience" for purposes of a violation of Jones's substantive due process rights, the officers were entitled to qualified immunity because it was not clearly established at the time of the incident that the officers' conduct violated those rights.  The estate appeals, and we **AFFIRM**.

## I.

In the early morning of January 23, 2006, Officers Byrnes and Lentine of the Redford Township police force were in their patrol car.  Officer Lentine was the driver. At approximately 5:00 a.m., the officers received a call from dispatch reporting an armed robbery at a 7-11 convenience store and that two black male suspects were fleeing on foot.  The officers drove towards the store.

As they approached the 7-11, the officers saw a Ford Taurus traveling at a high speed for that area, between fifty-five and sixty miles per hour.  The officers claim that the route the Taurus was driving is a well-known escape route used in previous crimes in that area.  Given the proximity to the 7-11, the high speed, and the supposedly well-

known escape route, the officers suspected that the Taurus was a getaway car for the robbers.

Officer Lentine turned on the cruiser's overhead lights and fell in behind the Taurus to attempt to pull it over. Instead of pulling over, the Taurus sped up. Officer Lentine turned on the cruiser's siren and advised police dispatch that the suspects were attempting to flee. A video of the chase taken by the police cruiser's on-board camera shows that it was still dark outside at the time. However, there was some ambient light from street lamps and businesses. Traffic was relatively light, but the roads were by no means deserted. Pedestrian traffic appears to have been very light.

The chase proceeded with speeds reaching sixty to seventy miles per hour. The Taurus ran several red lights and stop signs, and the officers followed suit. The officers witnessed the driver and passenger of the Taurus throwing objects out of the windows at various points during the chase.[2] Approximately four miles into the chase, the driver of the Taurus extinguished its headlights and continued to flee.

Although later acknowledging that the driver's decision to turn off the headlights escalated the risk to others, the officers continued the chase. The chase proceeded approximately two miles further. The Taurus approached a red light at the intersection of 9 Mile Road and Lahser in Southfield, Michigan. At that time, Jones was driving in the opposite direction on his way to work. As Jones turned left at the stoplight into a gas station, the Taurus ran the red light and collided with Jones's car. Tragically, Jones died from the collision.

As relevant to this appeal, Jones's estate filed suit under 42 U.S.C. § 1983, alleging that the officers' conduct—namely, their decision to continue the high-speed chase after the suspects had turned off the headlights of the Taurus—violated Jones's Fourteenth Amendment substantive due process right to be free from arbitrary deprivation of life and liberty at the hands of state actors. The estate contends that the

---

[2]Though unknown to the officers at that time, the discarded items turned out to be a gun and ammunition and, later, money.

officers' actions violated various local traffic ordinances as well as numerous departmental policies concerning pursuit.  The officers dispute this assertion, and there has been no finding that the officers violated any law or policy.

The officers raised the defense of qualified immunity and, after some discovery, the district court entered summary judgment for the officers.  The court found no constitutional violation and, in the alternative, that even if there was a violation the right was not clearly established.  *Jones v. Lentine*, No. 07-12756, 2008 U.S. Dist. LEXIS 50502 (E.D. Mich. June 30, 2008).  Jones timely appealed.

## II.

This appeal arises from the district court's order granting summary judgment for defendants.  We review the district court's grant of summary judgment *de novo*.  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007).  Summary judgment should be granted only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When we review a motion for summary judgment, we must view all facts and inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights.  *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006).  Until recently, the analytical sequence in addressing an assertion of the qualified immunity defense was the two-step sequential inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001).  Under *Katz*, a court first had to ask whether, viewed in the light most favorable to plaintiff, the facts show that the officer's conduct violated a constitutional right.  533 U.S. at 201.  If the answer to this first question was "no," the analysis proceeded no further because the plaintiff failed to establish a *prima facie* case

of violation of a constitutional right; thus the officer need not even seek the protection of qualified immunity. *Id.*; *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

If, however, the facts established a violation of the plaintiff's constitutional rights, *Katz* mandated that the next step was to determine whether the constitutional right was "clearly established" at the time of the violation. If not, the officer would be entitled to qualified immunity. *Katz*, 533 U.S. at 201. Under the "clearly established" inquiry, the question is whether the right was "so 'clearly established' that a reasonable official would understand that what he is doing violates that right." *Parsons*, 533 F.3d at 500 (quoting *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001)). "This inquiry . . . must be undertaken in consideration of the specific context of the case, not as a broad general proposition . . . . " *Katz*, 533 U.S. at 201. Previously, this Court has included a third inquiry to "increase the clarity" of the *Katz* analysis: "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)).

However, in *Pearson v. Callahan*, __ U.S __, 129 S. Ct. 808 (2009), the Supreme Court recently abandoned *Katz*'s requirement that courts address all qualified immunity inquiries sequentially. *Id.* at 813. The Court recognized that the lower courts had complained that the sequential mandate was cumbersome and often forced courts to decide constitutional questions unnecessarily, and also recognized that the sequential mandate was impossible to force on any given judge's thought process. On the other hand, the Court found that the *Katz* inquiry was still appropriate and a correct statement of the test for qualified immunity. Thus, the Court held that "while the sequence set forth [in *Katz*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand."  *Id.* at 818.  This generally means that "we are free to consider those questions in whatever order is appropriate in light of the issues before us," *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009), such that we need not decide whether a constitutional violation has occurred if we find that the officer's actions were nevertheless reasonable.  However, because *Pearson* left in place *Katz*'s core analysis, all pre-*Pearson* case law remains good law.

## IV.

### A.  Has the Estate Established a Violation of Jones's Right to Substantive Due Process?

The first question in the qualified immunity analysis is whether the plaintiff has established a *prima facie* case of a constitutional violation.  The estate alleges that the officers' conduct violated Jones's substantive due process rights guaranteed him by the Fourteenth Amendment.  Thus, we must first review the law of substantive due process claims in order to assess whether the estate has established a *prima facie* case.  More specifically, we must be familiar with the analysis used in scenarios involving police chases resulting in harm to suspects or third persons.

Generally speaking, the Fourteenth Amendment's due process provision has a substantive component that guarantees "protection of the individual against arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).  Of course, this is a broad proposition that must be applied to various scenarios where government action coincides with individual life and liberty.  One such scenario occurs when law enforcement pursues a suspect of a crime and either the suspect or third parties are injured.

The seminal case on point is the Supreme Court's 1998 decision in *Lewis*.  In *Lewis*, the Court confronted a scenario in which the police chased suspects fleeing on a motorcycle.  The individuals on the motorcycle were not suspected of any felony; instead, the officers had seen the motorcycle speeding and had told its driver to stop.  When the motorcycle sped off, the officers initiated a chase.  The chase lasted over one minute and reached speeds of one hundred miles per hour, with the police officer

following very closely behind the motorcycle. When the driver attempted to turn, the motorcycle flipped and threw both the driver and his passenger. The chasing police officer could not slow down or veer in time to avoid hitting the passenger, who was pronounced dead at the scene. 523 U.S. at 836-37. There was evidence that, in continuing the police chase, the officer had violated several intra-department guidelines regarding chases, such as engaging in a high-speed chase to apprehend a suspect of a relatively minor crime. *Id.* at 838-39.

The estate of the deceased passenger brought a section 1983 claim alleging violation of the passenger's substantive due process rights. The Ninth Circuit had held that recklessness or deliberate indifference was the test for finding a substantive due process violation. The Supreme Court reversed and held that, in the context of a police chase that results in injury, the test is whether the officer's actions "shock the conscience." *Id.* at 846-47. The Court further defined actions that can be said to shock the conscience as those that are motivated by an "intent to harm suspects physically or to worsen their legal plight" in a manner unrelated to the legitimate object of arrest. *Id.* at 836, 854.

The Court explained that the "shock the conscience" standard is unrelated to tort concepts of fault, "but rather points clearly away from liability, or clearly towards it, only at the ends of the tort law's spectrum of culpability" and that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848.

In the context of police chases, the Court stated that "[a] police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to everyone within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* at 853. Using these principles, the Court found that the officer's conduct, while perhaps reckless or deliberately indifferent to the well-being of the fleeing motorcyclists, did not rise to the conscience-shocking level because:

[The officer] was faced with a course of lawless behavior for which the police were not to blame. They had done nothing to cause [the driver's] high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes. [The driver's] outrageous behavior was practically instantaneous, and so was [the officer's] instinctive response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce [the driver's] lawlessness, or to terrorize, cause harm, or kill. Prudence, that is, was subject to countervailing enforcement considerations, and while [the officer] exaggerated their demands, there is no reason to believe that they were tainted by an improper or malicious motive on his part.

*Id.* at 855.

We recently applied *Lewis* in *Meals v. City of Memphis*, 493 F.3d 720 (6th Cir. 2007). *Meals* involved an officer who initiated and continued a high-speed chase of an automobile that had exceeded the speed limit. The officer continued the chase without turning on her car's blue lights or siren and without obtaining authority from a supervisor to continue the chase, both of which were violations of departmental policy on automobile pursuits. It was also a violation of departmental policy to continue chasing someone suspected only of a traffic violation or misdemeanor. *Id.* at 723-24. The driver of the fleeing vehicle eventually collided with another car, killing two of its occupants and rendering the driver a paraplegic.

The estates brought substantive due process claims, and the district court denied the officer's motion for summary judgment because it found that a jury could believe the officer's conduct, which violated many departmental regulations, shocked the conscience. *Id.* at 726. We reversed, finding that there was no evidence of an intent on the officer's part to harm the fleeing suspect or to worsen his legal plight. *Id.* at 730-31. We specifically rejected the argument that the officer's multiple violations of departmental policy at the very least raised a question of fact from which one could infer malice on the officer's part. *Id.*

In this case, the estate's argument is essentially that the officers should have suspended the chase when the suspects extinguished the Taurus's headlights. Their failure to do so, the estate argues, violated departmental policies and gives rise to an inference that the officers actually intended to harm the suspects, separate from the legitimate object of arrest, in a manner that shocks the conscience. However, if the officers' actions in *Lewis* and *Meals* did not rise to the level of shocking the conscience, then neither do the actions of the officers in this case.

First, it was undisputed that the officers in *Lewis* and *Meals* violated departmental policies regarding chases, whereas the alleged violations in this case are not so clear. And, second, this case involves a chase of suspected armed robbers whereas *Lewis* and *Meals* involved high-speed chases over mere traffic offenses. As the Supreme Court has indicated, the chase-or-not-to-chase question involves balancing the risk to human life against the need to enforce the law against offenders. *Lewis*, 523 U.S. at 853. Chasing suspected armed robbers tilts the balance much further towards continuing a dangerous chase than does chasing transgressors of the traffic laws,[3] yet both *Lewis* and *Meals* found that the decision to chase traffic offenders did not shock the conscience. In the end, as in *Lewis* and *Meals*, the estate has not produced any evidence that Officers Lentine or Byrnes were acting with any intent to harm the suspects instead of trying to apprehend what they reasonably believed to be dangerous criminals. Thus, as their actions do not shock the conscience, the estate has not established a *prima facie* case of deprivation of Jones's substantive due process rights.

---

[3]In a case involving a claim brought by a suspect who had been run off the road by an officer in order to end a chase, the Supreme Court recently stated "we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. . . . The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness." *Scott v. Harris*, 550 U.S. 372, 385-86 (2007) (emphasis in original). Although not on all fours because *Scott* involved a claim brought under the Fourth Amendment instead of the Fourteenth Amendment, the point still rings true.

### B.    Did the Officers Violate a Clearly Established Right?

In the alternative, even if the officers' actions did rise to the level of violating Jones's constitutional rights, it was not clearly established at the time of the incident that actions of that sort crossed the constitutional line. Neither side has cited any case, from any circuit or district court, in which an officer's actions in a police chase have ultimately been found to shock the conscience, nor are we aware of any such case.[4] As a result, although *Lewis* established in 1998 that an officer's conduct in a police chase could theoretically shock the conscience, there have been no examples of what specific kinds of conduct rise to that level. The "clearly established" inquiry "must be undertaken in consideration of the specific context of the case, not as a broad general proposition . . . ." *Katz*, 533 U.S. at 201. Thus, at present, it would be exceedingly difficult for an officer to be aware of what specific actions violate the clearly established general right of suspects and third parties to be free from arbitrary deprivation of life and liberty in police-pursuit scenarios. Certainly Officers Lentine and Byrnes had no guidance from this Court or the Supreme Court on what *would* shock the conscience, just what *would not*. The officers, therefore, would be entitled to qualified immunity even had we found that their actions shocked the conscience.

### V.

For the reasons set forth above, we **AFFIRM**.

---

[4]Several district courts have denied summary judgment in police-pursuit cases on the basis that a jury could find that the officer's conduct shocked the conscience, but all of those courts have been reversed on appeal. *E.g. Meals*, 493 F.3d at 730-31.

---

**CONCURRENCE**

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring.  I concur in the Court's disposition of this case.  Mr. Jones's death, though truly terrible, was not the result of a constitutional violation.  I write separately, however, to discuss a troubling problem highlighted by this case and to suggest an approach to apply in future cases that addresses this problem.

As the Court notes, neither party has cited a single example of a case, from any circuit or district court, in which an officer's actions in a police chase have ultimately been found to shock the conscience, and I am aware of no such case.  Thus, it appears that the set of examples of constitutionally impermissible police-pursuit behavior is currently an empty one.  Although surprising, this was not especially troubling under the mandatory analytical regime set forth in *Saucier v. Katz*, 533 U.S. 194 (2001).

Under *Katz*, even if a given police-pursuit case did not amount to a constitutional violation, the court would still have to go through the exercise of explaining why the police officer's actions did not shock the conscience.  However—at least in theory—sometime in the future a district court will find, and an appellate court will agree, that a police-pursuit case transgressed the Fourteenth Amendment threshold.[1] And if *Katz* still controlled, the court confronted with this future case would, as a matter of law, have to confront the constitutional question head on, finally establishing a positive data point announcing that this police action, whatever it is, crosses the line.

But *Katz* is no longer the law of the land; *Pearson v. Callahan*, 129 S. Ct. 808 (2009), is.  Under *Pearson*, courts are now generally free to address the two questions set forth in *Katz* in whichever order they deem appropriate in a particular case.  In

---

[1]As the Court's opinion notes, several district courts have believed that they have stumbled upon the fact pattern that could shock a jury's conscience and have denied qualified immunity at summary judgment, only to be reversed by the court of appeals.  *See supra* at 10 n.4.  At some point, a district court will come to the same conclusion as these previous district courts and, this time, the court of appeals will agree.

practice, this means that a court may avoid deciding whether a constitutional violation occurred if the court is of the belief that, even assuming a violation, it was not clearly established at the time of the incident that the officer's actions crossed whatever constitutional line is at play in a given case. Usually, traditional constitutional avoidance policies would counsel in favor of doing just that. These avoidance policies are why the Supreme Court's decision in *Pearson* makes sense now. In short, *Katz* generally served its purpose—in most section 1983 cases there are now sufficient data points to define the scope of constitutionally impermissible behavior. Thus, there is less of a need to continue developing the body of constitutional precedent, so the constitutional avoidance policies can come back into play.

However, police-pursuit cases do not fall within the group of section 1983 cases for which *Katz* accomplished its goal of developing constitutional precedent because the set of examples of impermissible police-pursuit behavior remains empty. I am therefore concerned about applying *Pearson* in future police-pursuit cases. Except in the most overwhelmingly egregious case, an officer that crosses the Fourteenth Amendment's threshold likely still would be entitled to qualified immunity because it was not clearly established that his specific actions were of the kind that crossed the line. Under *Pearson*, the court confronted with this officer's actions could avoid the constitutional question entirely and resolve the case on the clearly established prong. And so too could all subsequent courts.

This, of course, results in a self-perpetuating cycle in Fourteenth Amendment police-pursuit cases: district courts will skip the constitutional inquiry in favor of disposing of cases on the "clearly established" prong, so there will never be an actual finding that an officer's conduct shocks the conscience, so courts will continue to be able to dispose of cases on the "clearly established" prong, and so on. We could see a string of cases with the same refrain: "Even if the officer violated the Fourteenth Amendment in continuing this pursuit, it was not clearly established at the time of the incident that his actions violated plaintiff's constitutional rights. We therefore pass on the question whether a constitutional violation actually occurred, because we have discretion to do

so under *Pearson*, and find that the defendant is entitled to qualified immunity." The set of conscience-shocking fact patterns could remain empty, and no body of case law will develop to define the parameters of what police conduct in a pursuit case could shock the conscience.

This is a troubling potential because reflexive exercise of *Pearson* discretion in police-pursuit cases could result in essentially writing that cause of action off the books. Thankfully, I believe *Pearson* anticipates this very scenario and provides a safeguard against the extinction of difficult, but nonetheless valid, constitutional tort claims.

As I understand *Pearson*, the Supreme Court merely lifted the requirement that lower courts implement the *Katz* analytical sequence in all qualified immunity cases. However, *Pearson* "continue[d] to recognize that [the *Katz* protocol] is often beneficial." 129 S. Ct. at 818. Furthermore, Justice Alito's opinion explicitly addresses this very situation, where the body of constitutional law is thin or non-existent: "In addition, the *Saucier* Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent *and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable*." *Id.* (emphasis added).

I therefore read *Pearson* to encourage and support continued development of the constitutional law using a more targeted approach in small subsets of qualified immunity cases, such as police-pursuit cases, where the body of law still needs fattening.[2] I believe this to be the proper approach and applaud the Court's decision to address the constitutional question in this case even though not required under *Pearson*. I further encourage the district courts and future panels of this Court to follow suit in these kinds of cases by continuing to employ *Katz*'s analytical sequence.

---

[2]Although I have not surveyed the entire body of section 1983 case law to find other constitutional claims for which there are very few or no examples of impermissible state action, I am confident that they exist. My concern about *Pearson* resulting in a failure to adequately develop the constitutional precedent applies to those other constitutional claims just as strongly as it applies to police-pursuit cases, and so too does my suggestion of applying *Katz* in future cases that fall within these subsets.